CLARA E. EBMEIER, APPELLEE, V. PETER EBMEIER, APPELLANT.

FILED JUNE 12, 1930. No. 27374.

*H. G. Wellensiek* and *Frank A. Anderson,* for appellant.

*O. E. Bozarth, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON, EBERLY and DAY, JJ.

DEAN, J.

Clara E. Ebmeier began this suit in the district court for Gosper county against Peter Ebmeier, defendant, to recover damages in the sum of $25,000, for the alleged alienation, by defendant, of the affections of her husband, Herman J. Ebmeier, the defendant's son. The jury returned a verdict for plaintiff in the sum of $9,000, but the court required that plaintiff file a remittitur of $3,000, and thereupon a judgment was rendered against the defendant for $6,000, with interest at 7 per cent. per annum from November 7, 1929, until paid. The defendant has appealed.

The record discloses that, on May 24, 1927, the plaintiff arrived in Nebraska from her home in Germany and that shortly thereafter she found employment as a domestic in the defendant's home. November 24, 1927, or six months after her arrival in this state, the plaintiff and defendant's son were united in wedlock. The plaintiff was then under twenty-one years of age and her husband was in his thirty-fourth year. It is not denied that the defendant paid the transportation and other expenses of plaintiff's ocean voyage from Germany, amounting to $250, or about that sum, but it appears that plaintiff never received remuneration for work performed by her in the defendant's home.

Plaintiff contends that, to escape liability for the payment of current or usual wages to her, the defendant caused her to marry his son. But the plaintiff informed the jury that the defendant induced his son to abandon her and that he sought, soon thereafter, to cause the plaintiff to return to Germany. It also appears that, very shortly after the marriage, the plaintiff and her husband became tenants upon one of the defendant's farms, which was about two

miles from defendant's home, and that, on the farm, they lived happily together so long as they were unmolested by the defendant. But she alleges that, some time after the marriage, the defendant began to criticize and to find fault with her, without cause, and that he falsely charged her with having mistreated his son, who was then her husband, and that, as a result of the defendant's continuous unfriendly conduct in the premises, her husband became estranged, cold, and unsympathetic toward her, and the love and affection that her husband formerly lavished upon her was thereby utterly destroyed.

The plaintiff began a suit to obtain a divorce some time after the defendant and her husband, as she alleges, "had both personally refused to permit and allow the plaintiff to reside with her husband as his wife, and because she was a stranger in a strange land, inexperienced and not acquainted with the ways of the country in which she then found herself without means of support and after the defendant and her husband had refused to contribute to her support."

In defense, the defendant father-in-law alleged that the $250 that he advanced to plaintiff was to cover the expenses incident to her journey from her native land to the United States, and that it was agreed that plaintiff should work in his home as a domestic until she had repaid him for the money so advanced. In respect of the plaintiff's personality, he alleged her to be "of an exceedingly nervous temperament, easily excitable, very irritable, and has an ungovernable temper, and imperious and autocratic disposition." He denied that he ever advised plaintiff's husband concerning his personal affairs or his marital relations with plaintiff. But these features of the present case were questions of fact for the jury to determine.

In respect of the defendant's views on the subject, before plaintiff and his son were married, the plaintiff submitted these, among other facts, to the jury: "He (the defendant) said, 'Do you like Herman?' and I said, 'Yes,' and he said, 'Do you think you could marry?' and I said, 'Yes.'" Plaintiff also testified that she told the defendant

that she wanted to write to her father in Germany before she was married, but that defendant said, "Well, if you want to write to your father, until that letter comes back, by that time you are married." It appears that she yielded to the defendant's wishes and that she did not write to her father until after the marriage.

Plaintiff also testified that at one time, about a year after their marriage, she took the family car and drove to the mail box for the mail, and that, while she was there, the defendant drove up and took the key out of the car which she had driven, and told her he was going to give the key to his son. Continuing, she testified that the defendant then drove away in his own car and left plaintiff standing alone at the mail box and she was compelled to walk back to the house.

In referring to her husband, the plaintiff testified: "Well, we got along; all of the time from the time he (defendant) come over there Herman was not like he was. Q. Tell any other time he came over there. A. He came many times over there."

Concerning an incident when plaintiff was ill, she testified that the next day when defendant came over he said to her: "Well, you are not sick; you are just playing sick," and that she replied, "Yes, I am; I told Herman to take me to the doctor and he didn't do it." Defendant then said: "Well, if you just want to play sick you go back to Germany; Herman don't need to give you the money, I give you the money and you go back to Germany." At another time a calf upset a bucket of milk, and the defendant, blaming her for this circumstance, then said this to her in an imperious manner: "That is no work from a young woman to let the calf throw the milk over." But plaintiff testified that she was not present at the time of the accident.

On another occasion the plaintiff returned to her home and found the defendant there talking with her husband. She testified that her husband was crying at the time, and when she asked him what was the matter, the defendant interposed with this observation: "You don't need to ask; he can come home any time; he can come home with

me any time; my door is open; and you can go." The defendant then approached his son and said: "Herman, didn't she lick you; didn't she lick you?" and Herman replied, "Yes." But the plaintiff denied this charge, and she testified that defendant then said to her: "You go, I pay you $15 a week." But the plaintiff testified that she refused to leave her husband because she loved him.

The plaintiff also testified that, on the day before she left her home, referring to her husband and herself, she said: "We went out and milked the cows and came in, and we ate breakfast; out in the barn I asked Herman, 'What time is it?' and he didn't answer me then, and I said, 'Herman, what did I do to you that you don't answer?' and he didn't say anything; and I said, 'Herman, can you not tell me what you got against me?' He said, 'I have to stick by my father; nobody else going to give me anything but my father;' and so after that we went into the house and we ate breakfast, and then I asked him again, and he said, 'I don't care; you can go; I don't care a bit any more; I have to stick to my father.'" It appears that plaintiff then walked to a neighbor's house and when she returned to her home she said to the defendant: "Dad, can I come back to Herman again?" but he said, "No; you left once and you can not come back."

The defendant denied that his son ever told him about any trouble between himself and his wife, and he testified that he learned of some trouble between them from other of his sons and from his own wife. But the following letter was written by the defendant and sent to his daughter-in-law after she was separated from her husband:

"Bertrand, Nebraska,
"May 9th, 1929.

"Clara Ebmeier,
"Bertrand, Nebraska.

"Dear Clara: You should come back to my house and I board you for nothing and if you are able to work I pay you farmers average wages. And if you don't want to take that I try to send you back to your father in Germany and I pay the ticket and expense and even pay you by the

week when you go over there. And even I send a doctor along clear to New York to the ship and if you prove that the doctors on the ship couldn't handle you I would send a doctor along clear to your father.

"(Signed) Peter Ebmeier."

The above letter does not appear to need explanation, but the defendant explained to a witness just what he meant when he wrote it. This witness testified: "Q. Did you read the letter? A. Yes, sir; so after I read the letter I asked Mr. Ebmeier, I says, 'Do you mean that Clara should come to your house and live with Herman as husband and wife?' Q. What did he say? A. 'No, no;' he, says, 'I didn't mean it that way;' he says, 'She come here and work for me; Herman is going away.' "

The defendant complains that the court erred in the giving of certain instructions on behalf of the plaintiff and in refusing to give certain instructions requested by the defendant. Upon an examination of all of the instructions complained of by the defendant, we conclude that the learned trial court did not commit reversible error in the respects noted by the defendant. That the burden is upon a party litigant to establish every material fact upon which he relies is an established rule in this jurisdiction, and that plaintiff comes within this time honored rule clearly appears. That defendant's conduct was malicious throughout cannot be successfully controverted. In *Hope v. Twarling,* 111 Neb. 793, we said:

"In an action against a former mother-in-law for alienating the affections of her son from plaintiff, his wife, the failure of the trial court to submit to the jury the defense of parental advice is not erroneous, if there is no evidence to support a finding in favor of defendant on that issue."

We think the language of the above citation is applicable to the facts as relating to both of the parties before us in the present case. In the *Twarling* case this was also said:

"From repeated, deliberate, wrongful acts of a third person, resulting in the alienation of the affections of a husband from his wife and his abandonment of her without cause, malice of such third person may be inferred."

As pointed out herein, the defendant lived but a short distance from the plaintiff and her husband while they were on one of his farms and he often called on them there. The record throughout discloses the defendant as assuming the demeanor of an overbearing, insufferable autocrat in all of his interviews with his daughter-in-law, and that he attempted to assume the guardianship of both the newlyweds. And it may here be noted that the record discloses that plaintiff's husband was capable of managing his own business affairs without the meddling interference of the defendant. But for his unreasonable conduct toward his own son and his son's wife they would doubtless now be living happily together.

Plaintiff complains because the court ordered a remittitur of $3,000. But, in view of the fact that the learned trial court saw and heard the witnesses and therefore had a better opportunity to judge the weight of the evidence, we are not disposed to disturb the judgment in respect of the remittitur so ordered by the court.

The judgment of the district court is right and is therefore in all things

AFFIRMED.